**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**MATTHEW LEE FOSTER,**
    **Plaintiff,**

**v.**                                          **Case No. 5:10cv283/RH/CJK**

**MICHAEL ASTRUE,**
**Commissioner of Social Security,**
    **Defendant**.

---

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v.  The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for disability insurance benefits under Title II of the Act,  42 U.S.C. §§ 401-34.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are not supported by substantial evidence. The decision of the Commissioner, therefore, should be reversed.

## PROCEDURAL HISTORY

On May 16, 2003, Matthew L. Foster (who will be referred to by name, as plaintiff, or as claimant) protectively filed an application for disability insurance

benefits, alleging disability beginning January 31, 2003.  T. 87-89, 103, 406.[1]  The application was denied initially and upon reconsideration.  T. 71-79, 406.  Claimant filed a written request for hearing, which was held before an administrative law judge ("ALJ") on May 16, 2005.  T. 684.  In a decision dated July 12, 2005, the ALJ denied claimant's application for disability insurance benefits, finding Mr. Foster had not been under a disability within the meaning of the Social Security Act at any time through the date of the decision.  T. 406-15.

On August 31, 2007, the Appeals Council of the Social Security Administration vacated the ALJ's decision and remanded the case with orders to (1) give further consideration to the treating source opinions pursuant to the provisions of 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p and 96-5p, and explain the weight assigned to such opinion evidence, (2) give further consideration to claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations, and (3) if warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on claimant's ability to perform the demands of his past relevant work, and, as necessary, the occupational base for other work.[2]  T. 20, 417-19.  Of note, the Appeals Council remand commented further on the evaluation of the treating source opinions:

---

[1] The administrative record, as filed by the Commissioner, consists of six volumes (doc. 11 through 11-5), and has 780 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

[2] The Appeals Council also noted that claimant filed a subsequent claim for benefits on October 3, 2005, and the State agency found that Mr. Foster became disabled on June 17, 2005. T. 21.

> The decision does not even mention this [Dr. Zondlo's] opinion
> evidence.  The decision acknowledges the medical opinion evidence by
> Marcene Kreifels, M.D., the claimant's primary care physician (Exhibit
> 28F), but does not provide rationale for rejecting it, nor does it accord
> any weight to such opinion evidence.

T. 417.

On May 21, 2008, claimant appeared and testified at a second administrative hearing; Robert Strader, an impartial vocational expert, also appeared and testified. T. 20, 723.  In a decision dated January 16, 2009, the ALJ denied claimant's application for disability insurance benefits, finding Mr. Foster had not been under a disability within the meaning of the Social Security Act at any time from January 31, 2003, through June 16, 2005, the day before he was found to be disabled by virtue of a subsequent application.  T. 30-31.  The Appeals Council denied plaintiff's request for review in a notice dated September 2, 2010. T. 7-9.  The ALJ's decision thus stands as the final decision of the Commissioner and is now subject to review in this court pursuant to § 1383(c) of the Act.

<u>FINDINGS OF THE ALJ</u>

In the most recent written decision the ALJ made several findings relative to the issues raised in this appeal:

1.  Claimant meets the insured status requirements of the Social Security Act through March 31, 2008.

2.  Claimant has not engaged in substantial gainful activity at any time relevant to the administrative decision.

3.  Claimant had the following severe impairments for the period from his alleged onset date of January 31, 2003, through June 16, 2005, the day before he was

found to have become disabled:  possible fibromyalgia, degenerative disc disease, arthritis, history of triple coronary bypass graft, and an affective disorder.

4.  Claimant has not had an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, at any time relevant to the administrative decision.

5.  From his alleged onset date of January 31, 2003, through June 16, 2005, the day before he was found to have become disabled, claimant had the residual functional capacity to lift and/or carry, and push/pull 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for approximately six hours in an eight-hour day with normal breaks; occasionally climb, balance, stoop, kneel, crouch, or crawl secondary to back pain; and was limited in his handling ability as he could occasionally grip with his right hand.  Secondary to his mental disorder, claimant was capable of routine repetitive tasks on a sustained basis except was moderately limited in the ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

6.  Claimant is unable to perform any past relevant work.  Claimant was born on September 10, 1961, and was 42 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date.  Claimant has a sixth grade education and obtained his high school equivalency diploma.

7.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled," whether or not claimant has transferable job skills.

8.  Considering claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have performed.

9.  Claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2003, through June 16, 2005, the day before he was found to be disabled by virtue of his subsequent application.

## STANDARD OF REVIEW

"Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards." *Olds v. Astrue*, No. 5:09cv319/RS/EMT, 2011 WL 691595, at *1 (N.D. Fla. Jan. 19, 2011); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2.  If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.  If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.  Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  *See* 20 C.F.R. § 404.1512.  "If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform."  *Olds*, 2011 WL 691595, at *2.  "If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner."  *Id.*

<u>FACT BACKGROUND AND MEDICAL HISTORY</u>[3]

Plaintiff was born on September 10, 1961, making him 41 years of age on May 16, 2003, the date the application was filed.  T. 741.  Claimant indicated that he completed the sixth grade, but has received a GED.  T. 741.  Alleging disability beginning January 31, 2003, plaintiff cites a history of fibromyalgia and pain in the cervical spine and lower back.  T. 735.  Claimant reported past work experience as a long distance truck driver and construction laborer.  T. 741-42.

The medical evidence of record shows that claimant saw Dr. Marcene Kreifels, M.D., beginning in March 2004.  At his initial visit, plaintiff complained of chronic neck pain radiating to the right shoulder.  T. 345.  Dr. Kreifels noted the results of a July 2003 cervical spine MRI, which showed acquired spinal canal stenosis at C5-6 and C6-7 secondary to spondylosis at both levels with mildly bulging disc material at both levels, diffuse impingement at C5-6 with less prominent impingement at C6-7,

---

[3] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, this synopsis of medical evidence will be supplemented as called for in the Analysis section.

and foraminal stenosis bilaterally at both levels.[4]  T. 239, 345.  Dr. Kreifels also noted the opinion of neurosurgeon Dr. Dale Johns, who advised cervical disc surgery.  T. 345.  Initially, Dr. Kreifels assessed cervical spine stenosis with nerve impingement, chronic pain, insomnia, and gastroesophageal reflux disease ("GERD").  T. 345.

Complaining of continued stiffness and tenderness in his cervical spine, Mr. Foster saw Dr. Kreifels for a follow-up on April 23, 2004.  At claimant's request, Dr. Kreifels referred Mr. Foster to Dr. Frank Zondlo, M.D., for nerve blocks.  T. 345.  Diagnosing cervical degenerative disc disease, Dr. Kreifels also prescribed Lortab.  T. 345.  On July 28, 2004, plaintiff reported to Dr. Kreifels that Dr. Zondlo "advised him he also had fibromyalgia . . . ."  T. 346.  Dr. Kreifels assessed chronic pain, cervical degenerative disc disease, and fibromyalgia.  T. 346.  On August 6, 2004, Mr. Foster reported that since his previous visit, he had injured his lower back while shoveling dirt.  Claimant complained of pain radiating on the lateral aspect of his right thigh and leg, and stated that medication had not been effective.  On August 27, 2004, however, plaintiff stated that he experienced relief from the medication.  T. 346.  Dr. Kreifels diagnosed, *inter alia*, acute lumbar sacral sprain.  T. 347.

An MRI of the lumbar spine, dated August 6, 2004, revealed a disc herniation at L5-S1:

> There is a broad-based left posterolateral disc protrusion/developing disc extrusion (disc herniation) at L5-S1.  The disc material may irritate the left S1 nerve root within the spinal canal.   No nerve root impingement is appreciated.  There is a tiny shallow right paramedian

---

[4] An April 2003 MRI of the lumbar spine, to which Dr. Kreifels did not refer in his treatment notes, revealed mild degenerative disc dessication and facet arthropathy in the lower lumbar spine, but no herniated nucleus pulposus or significant central canal, lateral recess, or foraminal compromise.  T. 214.

> disc protrusion at L4-5 slightly asymmetrically indenting the thecal sac
> and resulting in borderline spinal canal stenosis.

T. 325.  On November 10, 2004, plaintiff reported back pain and pain associated with carpal tunnel syndrome.  T. 353.  Mimicking his observations from July 2004, Dr. Kreifels noted paravertebral muscle spasms in the lower back bilaterally, tenderness in the sacral area with palpation, and limited range of motion in the lumbar and cervical spines.  Diagnosing degenerative cervical disc and lumbar disease, Dr. Kreifels prescribed Neurontin, Percocet, and Soma.  T. 353.  Mr. Foster returned to Dr. Kreifels on December 15, 2004, when he asked the doctor to refer him for carpal tunnel syndrome surgery.  T. 353.  On January 12, 2005, claimant treated again with Dr. Kreifels, who assessed "chronic pain syndrome."  T. 353.

An operative report from Destin Surgery Center dated February 8, 2005, reveals that plaintiff underwent carpal ligament release on the right hand. Nonetheless, Mr. Foster complained to Dr. Kreifels on March 9, 2005, that the pain in his right hand and wrist persisted.  T. 354.  Dr. Kreifels diagnosed degenerative cervical disc and lumbar disease, insomnia, chronic pain syndrome, and carpal tunnel syndrome bilateral.  The doctor prescribed Elavil, an antidepressant, as well as Percodan.  T. 354.  In a letter dated May 13, 2005, Dr. Kreifels recounted claimant's diagnoses as fibromyalgia, carpal tunnel syndrome, cervical degenerative joint and disc disease with stenosis, both foraminal and central at C5-6 and C6-7, and possible cervical radiculopathy.  Noting "minimal disc bulges to disc herniation" from L3-4 to S1, Dr. Kreifels also assessed lumbar degenerative joint disease with stenosis.  "It is my opinion[,]" Dr. Kreifels asserted, "[that] this patient will not be able to work again."  T. 352.

Dr. Zondlo examined plaintiff on April 29, 2004, for evaluation of "diffuse pain syndrome" involving pain in the knee, ankle, neck, right shoulder and arm, anterior mid-chest, mid-back and upper back, and lower back extending through the anterolateral pelvis bilaterally.  Mr. Foster reported that the pain had been progressive over "many years" following trauma associated with three falls and a motor vehicle accident.  T. 321.  Claimant described his neck pain as the most severe,  stating that it radiates into the shoulders and right arm, causing numbness in the right hand.  T. 321.  According to plaintiff, the pain increases with weather changes, physical activity, walking, bending, and coughing.  T. 321.  Mr. Foster also complained of weakness in the right arm, right leg, low back, the hands, and neck.  T. 321.  Claimant reported a past medical history consisting of artherosclerotic cardiovascular disease with hypertension, osteoarthritis, bronchitis, anxiety and depression, GERD, migraine headaches, and bilateral carpal tunnel syndrome.  Dr. Zondlo noted that plaintiff smokes one pack of cigarettes per day.  T. 322.

Upon physical examination, Dr. Zondlo observed tenderness in the right C4, C5, and C6 paraspinous muscles, extending into the right and left trapezius and supraspinatus muscles, the upper half of the right scapula, and the right superior deltoid area.  T. 322.  Minimal limitation of neck range of motion with pain reported at the extremes of range of motion was noted.  T. 322.  Dr. Zondlo, however, observed "give-way weakness" in all the lower extremity muscle groups bilaterally and in all of the right upper extremity muscle groups, except for the trapezius.  T. 322.  Plaintiff, according to Dr. Zondlo, was unable to abduct his arm more than 75

degrees actively and unable to extend his elbow more than 80 degrees actively, although passively the elbow could be easily extended.  T. 322.

Dr. Zondlo further noted sensory impairment in the first three fingers on the right hand and dorsal C6 dermatome, as well as the right foot and thigh.  T. 322. Focal tenderness "of a quite marked degree" over the superior aspect of the right sacroiliac joint was also noted.  Finally, Dr. Zondlo's treatment notes reflect positive straight leg raising on the right causing focal L1 through L3 pain on the same side. T. 322.  Having also reviewed the results of claimant's 2003 cervical and lumbar spine MRIs in considerable detail, Dr. Zondlo assessed possible multi-level right cervical radiculopathy, right sacroiliac joint pain, and post-traumatic fibromyalgia. As discussed, Dr. Zondlo prescribed cervical epidural steroid injections and recommended that plaintiff continue his medications under the direction of Dr. Kreifels.  T. 321, 323.

Having received an initial epidural steroid injection on May 17, 2004, Mr. Foster presented to Dr. Zondlo on June 1, 2004, for reevaluation.  T. 320.  Dr. Zondlo observed sensory deficit in all five fingers of the right hand, but normal strength in the biceps and deltoids, which were previously weak on the initial exam.  T. 320. Experiencing severe headaches and pain upon palpation of the neck, claimant demanded that the exam be terminated.  T. 320.  Dr. Zondlo diagnosed a possible migraine headache brought on by the use of cortisone, and prescribed Percocet in lieu of Lortab, which plaintiff stated was of no benefit in relieving his pain.  T. 320.

On July 22, 2004, Mr. Foster presented to Dr. Zondlo for reevaluation and reported 30 percent less neck pain.  T. 318.  The pertinent findings on examination

included tenderness in the C5, C6, and C7 paraspinal muscles, trapezius muscle, and supraspinatus muscle bilaterally, in addition to "quite limited neck extension with otherwise full neck range of motion." T. 318. Dr. Zondlo also observed full strength in all muscle groups bilaterally, except for the right shoulder adductors and flexora, which had 3/5 strength reportedly secondary to pain. Tenderness was noted in the sacroiliac joints and paraspinal lumbar region, and straight leg raises produced pain in the neck and low back. T. 318. Dr. Zondlo could not offer a "definitive diagnosis":

> This patient has a diffuse pain syndrome with unusual findings that preclude a definitive diagnosis. Certainly there is neuroforaminal stenosis and some degree of spinal stenosis in the lower cervical spine . . . . I believe the most rational diagnosis for this patient is a post-traumatic fibromyalgia syndrome. He fulfills all of the diagnostic criteria for tender points developed by the American College of Rheumatology for the diagnosis of fibromyalgia.

T. 318-19. No return to Dr. Zondlo's clinic was indicated. T. 319. In a letter dated April 25, 2005, Dr. Zondlo stated, "[Mr. Foster] was disabled when I first met him on 4-29-04 and I believe that with the diagnosis of fibromyalgia syndrome he may well continue to be disabled." T. 351.

Claimant's history of medical intervention for his cardiovascular health is also noteworthy. On June 2, 2005, plaintiff underwent a triple coronary bypass graft. Mr. Foster was discharged to home on June 8, 2005, with a normal sinus rhythm and saturating at 93 percent on room air. A June 22, 2005, medical report from Sacred Heart Hospital revealed that plaintiff underwent 48 hours of monitoring due to complaints of heart fluttering and slurred speech. Test results showed abnormal wide

complex rhythm, rapid, consistent with ventricular tachycardia or supraventricular tachycardia with aberrancy.  Medical records from Baptist Hospital dated June 25, 2005, indicate that Mr. Foster experienced syncopal and presyncopal spells following the bypass procedure.  T. 628-31.

<u>HEARING BEFORE THE ALJ</u>

The relevant (second) administrative hearing commenced on May 21, 2008, with the testimony of Mr. Foster, who stated that he has been receiving disability benefits since December 2005.  T. 729.  Claimant testified that he completed the sixth grade, has a high school equivalent education, and is right hand dominant.  T. 741. Plaintiff described his previous employment as a long distance truck driver and construction laborer.  T. 741-42.  Mr. Foster asserted that he first started having problems with his heart around November 2004, when he began experiencing chest pains, weakness, and frequent fatigue.  Claimant underwent bypass surgery shortly after the initial hearing in June 2005 and had a pacemaker and defibrillator placed six months later.  T. 742-43.  Plaintiff testified that he exhausted himself walking the 100 yards and back from his house to a nearby pond, after which he would have to rest for 20 or 30 minutes.  T. 744.  Further, Mr. Foster stated that driving "long hours" exacerbated his symptoms.  T. 746.

Regarding his neck, claimant reported severe pain that averaged an eight on a scale of zero to ten.  T. 748.  Citing a fall in 1998 as the cause, plaintiff testified that his neck pain progressively worsened and was accompanied by migraine headaches and muscle spasms in the lower back that do not allow him to stand up straight.  T. 748-49.  Mr. Foster also complained of right leg pain that would sometimes cause the

leg to collapse.  T. 749.  Claimant recalled that the epidural injections administered by Dr. Zondlo reduced his cervical pain by 20 to 30 percent and helped his right arm as well.  T. 750.  Maneuvering his truck with his left arm, plaintiff testified that he worked through the pain.  Nevertheless, plaintiff asserted, he had to stop working in January 2003.  T. 751.  Mr. Foster testified that subsequent surgery alleviated some of his right arm pain, but also reported left arm damage.  T. 751.  Moreover, claimant stated that he has carpal tunnel syndrome in the right hand, for which he had surgery in February 2005.  T. 752.  Plaintiff explained that the surgery proved effective for "about three months," but now his hand goes numb with repeated use.  T. 752.  In early 2007, Mr. Foster had neck surgery.  T. 753.

From 2003 to 2005, according to claimant's testimony, he could stand only 10 to 20 minutes, sit for one hour before having to move, and had to lay down several times per day, despite pain medication.  T. 754-55.  Mr. Foster described the problems with his hands and arms, asserting that he could lift only "very light things" like a pizza box or a gallon of milk.  T. 756-57.  Noting his lack of attention span and inability to concentrate, claimant said the constant pain caused him to be extremely irritable and short-tempered.  T. 758-59.  Having been on Morphine from 2003 through most of 2007, plaintiff started taking Tramadol, a non-narcotic, in early 2008.  T. 760-61.

Describing his daily activities during the relevant time period, Mr. Foster testified that he drove only on occasion to the grocery store and that his longest drive was 45 minutes.  T. 762.  Following that drive, claimant averred, he experienced "[n]ine heart attacks in a row" and was admitted to Baptist Hospital in Nashville,

Tennessee.[5]  Plaintiff was then transferred to Pensacola for open heart surgery in June 2005.  T. 762-63.  Though he could climb a flight of stairs, such activity caused chest pain, extreme perspiration, and severe fatigue.  T. 764-65.  Despite back and arm pain, Mr. Foster also used a riding mower to do yard work.  T. 765.

Upon the conclusion of Mr. Foster's testimony, the ALJ phrased a question to Robert N. Strader, an impartial vocational expert, as to claimant's work prospects:

> We need to go back to the '03 to '05 time period.  The Claimant was born in '61 so that means the Claimant would be, it looks like, 44. . . . [L]et's assume the individual is 44 years of age, has completed the sixth grade and the GED and has a commercial's [sic] driver's license and let's assume a good ability to read, write and use numbers.  Let's assume the past work history that you just described as the truck driver in 19E and also let's assume the  following restrictions.  We'll start with the DDS restrictions in Exhibit #17F and 25F and I would note that quite a few exhibits have come in, I mean, like hundreds of pages have come in since these exhibits were prepared. . . .  Let's assume the individual can occasionally lift 20 pounds, frequently lift 10 pounds, stand about six hours, walk about six hours and sit about six hours in an eight-hour day with normal breaks.  The person can only occasionally do the postural activities including climbing, balancing, stooping, kneeling, crouching and crawling.  Those are all due to the back pain. This person has limited handling, only -- this person can only occasionally use the right hand for gripping and those are the primary restrictions there.  From the mental side of things on 25F, there are moderate restrictions in the ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace with[out] an unreasonable number and length of rest periods, to accept

---

[5] The ALJ noted an absence of record support for plaintiff's allegation that he suffered nine heart attacks, acknowledging that plaintiff "merely . . . reported extreme chest pain for 3 days . . . .  T. 27.

> instruction and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and I believe those are the primary restrictions. And then on page three we have the functional capacity assessment which, let's see, the person may have difficulty with concentration at times, memory and cognition appears essentially intact, presents with irritability and temper outbursts at times, may be expected to have difficulty handling criticism, get along with co-workers, does appear capable of adequate social interaction in general, appears capable of adequate adaptation and of routine, repetitive task performance on a sustained base. So with those restrictions and abilities, physical and mental, would there be any jobs in the regional or national economy such a person could perform?

T. 767-69. Mr. Strader replied that such a residual functional capacity and vocational profile would not allow the individual to perform his past work. T. 769. Identifying positions like gate guard, surveillance system monitor, and shipping and receiving clerk, however, Mr. Strader explained that there would be other jobs available that the hypothetical individual could perform. T. 769-70.

Plaintiff's attorney then posed a second hypothetical question, altering the parameters to account for Mr. Foster's testimony:

> And specifically he stated that during that timeframe he would have to lie down for half an hour to an hour a day, three times a day, amongst other restrictions, with that limitation, would such an individual be able to maintain employment at a competitive level at these unskilled positions with the restrictions that was [sic] given in hypothetical one?

T. 771. The vocational expert testified that such an individual "would be unemployable if that is the situation." T. 771.

ANALYSIS

Plaintiff raises two issues in this appeal, arguing (1) that the ALJ failed to properly evaluate the medical opinions of his treating physicians, Drs. Kreifels and Zondlo, and (2) that the ALJ failed to issue a credibility finding in compliance with the law of the Eleventh Circuit.  (Doc. 14, 8)  Claimant contends first that the ALJ did not assign adequate weight to the opinions of Dr. Kreifels or Dr. Zondlo.   In evaluating the opinions of both treating physicians, the ALJ explained that the relevant findings were "not accompanied by objective medical evidence . . . ."  T. 28. Turning initially to the opinions of Dr. Zondlo, the court observes that the ALJ discounted the findings of this pain management physician because he did not "definitively diagnose fibromyalgia and merely stated it as a possible diagnosis" and in light of the opinion of the consulting examiner, Dr. Sam Banner, "who failed [to] note fibromyalgia as a diagnosis . . . ."  T. 28.

It is well-settled that "[t]he opinion of a treating physician is to be given substantial weight in determining disability."  *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986); *see also Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) ("Absent a showing of good cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the Secretary.").  "'[G]ood cause exists when the:  (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).   "The ALJ *must clearly articulate* the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis v. Callahan*, 125 F.3d

1436, 1440 (11th Cir. 1997) (emphasis added); *see also* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight".).

The ALJ's reasoning for discounting the opinion of Dr. Zondlo is, frankly, problematic. Having reviewed the pertinent treatment notes in their entirety, the court concludes first that Dr. Zondlo's diagnosis of fibromyalgia was not so tentative as the ALJ indicated. After examining claimant for the final time, Dr. Zondlo determined that Mr. Foster "fulfills all of the diagnostic criteria for tender points developed by the America College of Rheumatology for the diagnosis of fibromyalgia." T. 318-19. "'[T]here are no objective tests which can conclusively confirm [fibromyalgia],'" *see Somogy v. Commissioner of Social Security*, 366 F. App'x 56, 63-64 (11th Cir. 2010) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)). Nevertheles, Dr. Zondlo, contrary to the ALJ's assertion, did in fact document objective medical evidence of the elusive condition. On multiple occasions, moreover, Dr. Zondlo assessed diffuse pain syndrome, a hallmark of fibromyalgia. *See id.* at 64 n.11.

Simply put (and relying upon case law discussing the condition), fibromyalgia is defined by chronic diffuse pain of unknown etiology and, owing to the lack of reliable laboratory tests, is notoriously difficult to diagnose. *See id.* at 64 (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (observing that fibromyalgia "often lacks medical or

laboratory signs, and is generally diagnosed mostly on an individual's described symptoms").   Given the presence of the criterial tender points and plaintiff's subjective complaints of diffuse pain, the court is unpersuaded that Dr. Zondlo's opinion should have been so adroitly discounted merely because it was not accompanied by "objective medical evidence" or because the doctor failed to diagnose fibromyalgia with absolute certitude.  *See Somogy*, 366 F. App'x at 64 (recalling that "'the nature of fibromyalgia itself renders . . . over-emphasis upon objective findings inappropriate'" (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007))).

Nor does the court agree that Dr. Zondlo's opinion was contradicted by the findings of consulting physician Dr. Banner, who examined Mr. Foster on July 15, 2003.   Dr. Banner diagnosed, *inter alia*, bilateral carpal tunnel syndrome and "[c]hronic pain."  T. 237.  The ALJ correctly noted that Dr. Banner failed to note fibromyalgia as a diagnosis, but went further by finding that Dr. Banner's opinion "contradicted" the diagnosis of fibromyalgia.  T. 28.  That Dr. Banner (who did diagnose "chronic pain") did not identify fibromyalgia does not undermine the findings of Dr. Zondlo, who examined claimant no fewer than four times.  *See Moore*, 405 F.3d at 1212 (asserting that "a treating physician's testimony can be particularly valuable in fibromyalgia cases, where objective evidence is often absent").   Dr. Banner also did not diagnose some medically determinable impairments objectively confirmed by the record (like degenerative disc disease), which is to say that the results of Dr. Banner's examination were not exhaustive.  Although Dr. Banner's opinion may neither bolster nor confirm Dr. Zondlo's fibromyalgia diagnosis, it does

not, as the ALJ intimated, demonstrate exclusion of that assessment. In sum, the ALJ's assertion that Dr. Zondlo's opinion is "contradicted" by the findings of Dr. Banner is not supported by substantial evidence.

The court considers next the opinions of Dr. Kreifels, which the ALJ discounted because "none of Dr. Kreifels [sic] progress notes even mention a diagnosis of fibromyalgia." T. 28. The court, having reviewed all of Dr. Kreifels's progress notes, observes at the outset that this is not entirely accurate. In fact, Dr. Kreifels assessed fibromyalgia on July 28, 2004, when he also diagnosed cervical degenerative disc disease and chronic pain. T. 346. In both January and March 2005, Dr. Kreifels diagnosed "chronic pain syndrome," which, though not necessarily synonymous with fibromyalgia, is (as shown above) an integral component of that condition. T. 353-54. The medical evidence of record thus contradicts the ALJ's only specific reason for discrediting the opinion of Dr. Kreifels.

The Commissioner argues that the ALJ, in giving little weight to the opinions of plaintiff's treating physicians, asserted that the findings of Drs. Zondlo and Kreifels were not accompanied by objective medical evidence and were not bolstered by the record. T. 28. As the court has already explained, a lack of objective medical evidence does not always invalidate the subject findings where the condition at issue is fibromyalgia. *See Somogy*, 366 F. App'x at 64. But assuming *arguendo* this were the case, the ALJ would have, nevertheless, been obligated to articulate with far greater specificity the reasons for giving less weight to the opinion of the treating physicians. *See* SSR 96-2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the

treating source's medical opinion . . . and must be sufficiently specific to make clear to any subsequent reviewers . . . the reasons for that weight".). The "good cause" exception may well enjoy broad application. *See, e.g.*, *Phillips*, 357 F.3d at 1240-41; *Lewis*, 125 F.3d at 1440; *Lamb*, 847 F.2d at 703. Merely deploying the triggering language for the "good cause" exception, however, will not do, because such brevity does not allow this court to meaningfully review the ALJ's determinations for record support. *See Poplardo v. Astrue*, No. 3:06-cv-1101-J-MCR, 2008 WL 68593, at *11 (M.D. Fla. Jan. 4, 2008) ("Although these claims [made by the ALJ] use the triggering language for the 'good cause' exception, they remain unsubstantiated by any specific evidence, and provide the reviewing Court with little guidance in determining whether the findings are supported by substantial evidence.").

Of even greater concern here is the ALJ's failure to address the implications of any of the objective medical evidence generated by the treating physicians, including the results of diagnostic testing and physical examinations. The ALJ has, perhaps, constructed a straw man by focusing almost entirely on the diagnosis of fibromyalgia, to the exclusion of substantial medical evidence tending to establish a number of independent, objectively verifiable impairments. For instance, an April 2003 MRI of claimant's lumbar spine showed mild degenerative disc dessication and facet arthropathy in the lower lumbar spine. T. 214. A July 2003 cervical spine MRI revealed acquired spinal canal stenosis at C5-6 and C6-7 secondary to spondylosis at both levels with mildly bulging disc material at both levels, diffuse impingement at C5-6 with less prominent impingement at C6-7, and foraminal stenosis bilaterally at both levels. T. 239, 345. A second MRI of the lumbar spine, performed August

6, 2004, showed a broad-based left posterolateral disc protrusion/developing disc herniation at L5-S1, which may irritate the left S1 nerve root within the spinal canal. The scan also showed a tiny shallow right paramedian disc protrusion at L4-5 slightly asymmetrically indenting the thecal sac and resulting in borderline spinal canal stenosis.  T. 325.

Further, the record contains fairly extensive physical examination evidence tending to indicate pathology.   On multiple occasions, Dr. Kreifels noted paravertebral muscle spasms in the lower back bilaterally, tenderness in the sacral area with palpation, and limited range of motion in the lumbar and cervical spines. T. 353.  Dr. Zondlo observed tenderness in the right C4, C5, and C6 paraspinous muscles, extending into the right and left trapezius and supraspinatus muscles, the upper half of the right scapula, and the right superior deltoid area.  T. 322.  Observing "give-way weakness" in all the lower extremity muscle groups bilaterally and in all of the right upper extremity muscle groups (except for the trapezius), Dr. Zondlo noted that plaintiff was unable to abduct his arm more than 75 degrees actively and unable to extend his elbow more than 80 degrees actively.  T. 322.  Dr. Zondlo further noted sensory impairment in the first three fingers on the right hand and dorsal C6 dermatome, as well as the right foot and thigh.  T. 322.  Focal tenderness "of a quite marked degree" over the superior aspect of the right sacroiliac joint, as well as positive straight leg raising, were also noted.  T. 322.

The import, which cannot be overlooked by this reviewing court, of the foregoing evidence is conspicuous only in its absence from the ALJ's decision.  The ALJ failed to evaluate this evidence in even a cursory manner, let alone to identify

contrasting findings.  In contravention of the pertinent regulations, the ALJ neglected to reconcile the relevant medical evidence with Mr. Foster's claims of disability.  *See* SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996) ("The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").  The court need not draw conclusions as to how a synthesis of such evidence would have weighed in the ALJ's articulation of a residual functional capacity.  The court finds simply that the ALJ failed to point to substantial evidence in the record to discount the opinions of claimant's treating physicians.  Accordingly, the court concludes that the ALJ failed to follow the law governing the substantial weight to be given to the opinions of such medical providers, and that the ALJ's decision was not based upon substantial evidence.  *See Garvey v. Astrue*, No. 1:07-cv-00021-MP-WCS, 2007 WL 4403525, at *1 (N.D. Fla. Dec. 12, 2007).

For his second point, plaintiff argues that the ALJ failed to issue a credibility finding in compliance with Eleventh Circuit law.  The ALJ made a negative credibility finding, writing, "the claimant's medically determinable impairments could reasonably have been expected to produce the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons set forth above."  T. 29.  Mr. Foster contends that the ALJ failed to articulate "any actual reasons or point out any medical evidence to the contrary that would negate [his] testimony or make it any less credible."  (Doc. 14, 23)

"It is established that pain alone can be disabling, even when its existence is unsupported by objective evidence." *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987).  Pursuant to *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991), an ALJ must apply a three part "pain standard" when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id.*  "The standard also applies to complaints of subjective conditions other than pain." *Id.*

"After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992).  "If the ALJ refused to credit subjective pain testimony where such testimony is critical, he must articulate specific reasons for questioning the claimant's credibility." *Id.*  "While an adequate credibility finding need not cite 'particular phrases or formulations . . . broad findings that [a claimant] lacked credibility and could return to [his] past work alone are not enough to enable [the court] to conclude that [the ALJ] considered [claimant's] medical condition as a whole.'" *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting *Jamison v. Bowen*, 814 F.2d 585, 590 (11th Cir. 1987)).  "Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Holt*, 921 F.2d at 1223.

The record is not lacking in plaintiff's complaints of pain and other subjective conditions.  For example, Mr. Foster testified that he experiences neck pain that averages an eight on a scale of zero to ten.  T. 748.  Muscle spasms in the lower back prevent claimant from standing up straight.  T. 748-49.  Plaintiff stated that he has pain in both arms and that his right hand becomes numb secondary to carpal tunnel syndrome.  T. 751-52.  Mr. Foster explained that despite pain medication, he could stand just 10 to 20 minutes and sit for one hour before having to switch positions.  T. 754-55.  Claimant also reported that the pain diminishes his attention span and ability to concentrate, and prevents him from lifting all but light items such as a gallon of milk.  T. 756-59.  Even Dr. Banner diagnosed "[c]hronic pain."  T. 237.  The court observes that the ALJ recounted much of this testimony in his written decision.  T. 26-27.

Having conducted a thorough review of the administrative decision, however, the court determines that the ALJ did not state with any degree of particularity the reasons for discrediting plaintiff's "statements concerning the intensity, persistence and limiting effects" of his pain and other subjective conditions.  With the exception of a residual functional capacity assessment provided by Dr. Edward W. Holifield, M.D., a non-examining reviewing physician, the ALJ did not cite any evidence tending to contradict Mr. Foster's testimony concerning the intensity, persistence, and limiting effects of his pain.  T. 29, 288-95.  This court will not completely discount opinions of reviewing consultants, but also may not ignore law to the effect that "[t]he reports of reviewing nonexamining physicians do not constitute substantial evidence on which to base an administrative decision."  *Lamb v. Bowen*, 847 F.2d 698, 703

(11th Cir. 1988); *see also Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) ("The opinions of nonexamining, reviewing physicians . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence."). Further, as discussed above, the ALJ could not properly rely on the perceived infirmities in the diagnosis of fibromyalgia as a reason to discount the testimony of disabling pain.

Rather than consider the allegations of severe disabling pain in any detail, the ALJ, in a conclusory manner, simply found that neither the medical evidence nor claimant's testimony established the existence of such pain. Such resolution of the critical question of credibility stands at odds with the prevailing legal standard. *See Holt*, 921 F.2d at 1223 ("[T]he ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." ); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (providing that "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible'" or "for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms"). The court concludes that the ALJ's credibility determination is not supported by substantial evidence and therefore cannot stand. *Marbury*, 957 F.2d at 839.

## REMEDY AND CONCLUSION

The district court's review of the Commissioner's decision is limited. *See Bloodsworth*, 703 F.2d at 1239 ("Even if we find that the evidence preponderates against the [Commissioner's] decision, we must affirm if the decision is supported by

substantial evidence."). Nevertheless, "[w]ithin this narrowly circumscribed role," the courts "do not act as automatons." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Rather, this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* Having reviewed all the medical evidence of record, the court concludes that the ALJ's evaluation of the opinions of claimant's treating physicians is not supported by substantial evidence and that the ALJ failed to articulate the reasons for discrediting Mr. Foster's subjective pain testimony. The Commissioner's decision is, thus, undermined.

The court is left to determine the remedy. The controlling statute provides, "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Of late, the question of remedy in instances of error involving treating physician opinion and subjective pain testimony has been discussed in this circuit with some regularity. *See, e.g.*, *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 835 (11th Cir. 2011) (remanding for further consideration where ALJ "failed to adequately explain the weight he afforded to the opinions of . . . treating and examining physicians"); *Howell v. Astrue*, No. 8:10–CV–2175–T–26TGW, 2011 WL 4002557 (M.D. Fla. Aug. 16, 2011) (remanding where ALJ failed to provide a meaningful explanation for credibility determination); *Freeman v. Astrue*, No. 1:10–cv–997–TFM, 2011 WL 2551181, at *3 (M.D. Ala. June 27, 2011) (remanding where ALJ "made a credibility determination, but did not adequately explain it");

*Carpenter v. Astrue*, No. 8:10-CV-290-T-TGW, 2011 WL 767652 (M.D. Fla. Feb. 25, 2011) (same).  This court, too, has opted recently to remand for further consideration where the ALJ improperly discredited the opinions of a treating physician and rejected the claimant's subjective complaints of pain.  *See Hillerich v. Astrue*, No. 5:10cv326-RH-CJK (N.D. Fla. Jan. 17, 2012).

In this instance, however, the light shed by the foregoing cases does not reveal the appropriate remedy.  For whatever reason, here, the ALJ has twice shunted aside the substance and import of the treating physician opinions, despite explicitly plain direction from the Appeals Council remand to make a more detailed accounting of those findings.  T. 418.  More importantly, the opinions of Drs. Zondlo and Kreifels are not only consistent with plaintiff's testimony, the objective diagnostics, and the body of medical evidence as a whole, but encounter little, if any, resistance from the remainder of the record.  In other words, any administrative decision that is to be supported by substantial evidence must in large part internalize the validity of these findings and opinions.

As in *Hillerich*, the court is persuaded that the residual functional capacity must now reflect claimant's subjective pain testimony.  When reasonably read, the hypothetical rejected by the ALJ, in which claimant's attorney offered that Mr. Foster would need to lie down for 30 to 60 minutes three times per day, takes into account the complaints of severe pain.  T. 771.  Under examination by plaintiff's counsel, the vocational expert acknowledged that Mr. Foster "would be unemployable if that is the situation."  T. 771.  Claimant's subjective complaints of disabling pain, and the limitations concomitant to those complaints, must now be included in the residual

functional capacity as assumed by the vocational expert. *See Holt*, 921 F.2d at 1223 ("Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true."). Coupled with the ALJ's failure to evaluate the uncontroverted treating source opinions on two occasions, the degree of limitation as reflected in the residual functional capacity, as properly constructed with consideration of plaintiff's complaints, persuades the court that nothing further would be accomplished by remanding the cause for rehearing. *See Hillerich* (remanding that case, "but without prejudice to other parties who might more fully brief the issue of remedy, or who might persuade the court that the evidence points unequivocally to a specific finding, without need for remand"). Consequently, the decision of the Commissioner should be reversed with instructions that it be returned to the Commissioner for the award of disability insurance benefits.

Accordingly, it is respectfully RECOMMENDED:

1.  That the decision of the Commissioner be REVERSED, and the application for disability insurance benefits be GRANTED.

2.  That the court reserve jurisdiction to award attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

At Pensacola, Florida, this 17th day of January, 2012.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).